UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE EXPO GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| VS. | ) | |
| | ) | 3:19-CV-1356-G |
| JEFF CASTILLO, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

This action was brought by the plaintiff, The Expo Group ("TEG"), against its former employee, Jeff Castillo ("Castillo," or "the defendant"), and arises from the defendant's alleged breach of a non-disclosure and non-solicitation agreement. Before the court is the plaintiff's motion for a preliminary injunction. In accordance with Rule 52 of the Federal Rules of Civil Procedure, the court sets forth its findings of fact and conclusions of law below. For the reasons stated, the plaintiff's motion for a preliminary injunction is granted.

## II. <u>FINDINGS OF FACT</u>

The Expo Group ("TEG") is a national company that specializes in assisting clients grow their attendee, exhibitor, and sponsorship revenue at trade shows. Notice of Removal (docket entry 1), Exhibit A, ¶ 2.

1.      During or prior to July 2018, TEG purchased one of its competitors--Xpert.  *See* Appendix to Plaintiff's Brief in Support of Motion for Preliminary Injunction ("Appendix in Support") (docket entry 23) at 58, 110.

2.      The defendant, Jeff Castillo, worked as an account manager and then as director of account management at Xpert from 2015 until July 2018, when Xpert was purchased by TEG.  *Id.* at 58.

3.      Incident to the purchase, TEG acquired all of Xpert's equipment, property, industry knowledge, and trade secrets.  *Id.* at 110.

4.      Following the purchase, Castillo was hired as an account manager involved in the production of trade shows at TEG in July, 2018.  *Id.* at 58.

5.      On July 20, 2018, Castillo and TEG executed two agreements relating to Castillo's employment: a "Non-Disclosure and Non-Solicitation Agreement," (the "NDA"), and a "Confidentiality and Intellectual Property Agreement" (the "confidentiality agreement").  *See* Appendix in Support at 5-6; 16-18.

6.      The confidentiality agreement defines confidential information to

include "information concerning technical, administrative, management, financial or marketing activities of, or relating in any way to, TEG, its customers or its business (such as procedures, information processing processes, marketing plans and strategies, customer names, financial data, employee and salary information)." Appendix in Support at 16. The NDA provides that "[d]uring [Castillo]'s employment with TEG, TEG shall provide [Castillo] with access to some of TEG's confidential information." *Id.* at 5.

7.      In return, the NDA provides that during Castillo's employment at TEG and for 24 months thereafter, Castillo will not "solicit, call on, communicate with, do business with, or attempt to do business with" any person or entity which is, or was at any time in the previous 12 months, a TEG client with which Castillo worked, "or about which [Castillo] received confidential information from TEG." Appendix in Support at 5, ¶ 3 ("the non-solicitation covenant").

8.      While working for TEG, Castillo managed trade shows and budgets, handled graphics, entertained clients, and went on sales pitches. *Id.* at 120. Castillo had access to some of TEG's confidential information, including customer data, customer lists, marketing plans, and pricing arrangements. *Id.* at 113, 120. Castillo also had access to the financial books and records for the shows that he worked on at TEG. *Id.* at 121.

9.      Castillo worked with ten TEG clients between July 2018, when he was

hired, and January 18, 2019, when he left the company.[1]  Appendix in Support at

2-3, 93.  Among them were the Cowboy Christmas and Rocky Mountain Elk

Foundation ("RMEF") shows: two events that occur annually and concurrently in the

same event space and are owned by the same company, Las Vegas Events.  *Id.* at 2,

69, 157; Defendant's Response to Plaintiff's Proposed Findings of Fact and

Conclusion of Law ("Defendant's Findings") (docket entry 34) at 38.

　　　　10.　　Castillo worked on the 2015, 2016 and 2017 Cowboy Christmas shows

as an account manager for Xpert.  Appendix in Support at 73.

　　　　11.　　Castillo served as TEG's account manager for the Cowboy Christmas

show in December, 2018, during the course of which he worked with and established

a relationship with Bo Gardner ("Gardner").  Appendix in Support at 81, 101.

Gardner was and remains an employee of Las Vegas Events, the company that owns

the Cowboy Christmas and RMEF events.  *Id.* at 35, 101.

　　　　12.　　On January 5, 2019, Castillo accepted a position as an account manager

at Las Vegas Expo ("LVE"), one of TEG's competitors.  Appendix in Support at 22,

64, 152.  Then, on January 8, Castillo formally notified TEG that he was resigning

---

[1]　　These clients are: 1) Cowboy Christmas; 2) Rocky Mountain Elk Foundation
(RMEF); 3) Barrett-Jackson; 4) Rock N Roll Marathon; 5) VIVA Las Vegas; 6)
ThoughtSpot; 7) NFM (Genetech); 8) PAI Innkeepers; 9) United Union of
Roofers, Water Proofers and Allied Workers; and 10) Service Management and
Automation User Conference (SMAC). Appendix in Support at 2-3.

from TEG and that January 18, 2019 would be his last day with TEG. *Id.* at 8, 64.

Castillo began working at LVE the following day, on January 19, 2019. *Id.* at 160.

13.     Also in January 2019, though after he had left TEG, Castillo played golf with Gardner and informed him that he had left TEG and taken a job at LVE. Appendix in Support at 62.

14.     This was the first time that Castillo, while employed by LVE, discussed Cowboy Christmas with someone authorized to do business on behalf of Las Vegas Events. Defendant Jeff Castillo's Response to Plaintiff's Motion for Preliminary Injunction ("Response")(docket entry 26), Exhibit 1, ¶ 13. Gardner asked Castillo if LVE is permitted to work in the convention center in which Cowboy Christmas was held in 2018, to which Castillo responded "yes." Appendix in Support at 62; Response, Exhibit 1, ¶ 13.

15.     On February 19, 2019, Castillo sent the president of LVE, Nicholas Cordaro, an email stating that Castillo had "added Las Vegas Events into [LVE's database] as a prospect," and outlining information about both RMEF and Cowboy Christmas that Castillo had obtained from his work on Cowboy Christmas in 2015, 2016, 2017, and 2018. Appendix in Support at 23, 72-73. Cordaro replied later that day, instructing Castillo to "get the show." *Id.* at 24.

16.     Castillo also arranged a lunch meeting between himself, Cordaro, and

Gardner, which took place in late February or early March of 2019. Appendix in Support at 68-69. During this meeting, the men discussed Cowboy Christmas's branding change, its storage needs, and plans for the 2021 Cowboy Christmas and RMEF events. *Id.* at 69.

17. On March 19, 2019, Castillo sent Cordaro a draft of a proposal for the 2019 Cowboy Christmas event. *See* Appendix in Support at 26, 73.

18. On March 25, 2019, Castillo emailed several LVE employees, including Nicholas Cordaro, stating that the Cowboy Christmas proposal had been sent to Las Vegas Events, and that Castillo would be following up with Las Vegas Events's "decision maker." Appendix in Support at 27. Castillo also stated: "Along with Cowboy we may end up with RMEF." *Id.* Castillo included in his email detailed information about the aisle carpet, structures, graphics, and storage requirements for the Cowboy Christmas and RMEF shows, *id.*: information Castillo obtained from his work on Cowboy Christmas in 2015, 2016, 2017, and 2018. *Id.* at 74-75.

19. On May 10, Castillo sent a revised Cowboy Christmas 2019 proposal to Rebecca Nau, Las Vegas Events's Corporate Marketing Partnership Manager. *Id.* at 33, 37, 78. Castillo followed up with Nau five days later, on May 15, 2019, to ask if there had been any word as to whether LVE would be awarded the contract for Cowboy Christmas 2019. *Id.* at 38, 78.

20. On May 29, 2019, Gardner sent an email to Castillo stating that Las

Vegas Events is "prepared to move forward" with the agreement with LVE, provided that several of Las Vegas Events's concerns were addressed. Appendix in Support at 35.

21.     TEG discovered Castillo's involvement in LVE's efforts to bid for the 2019 Cowboy Christmas contract some time after May 16, 2019, when Gardner mistakenly sent an email regarding Cowboy Christmas to the email address Castillo used while working at The Expo Group. Appendix in Support at 11, 12; Proposed Findings of Fact and Conclusions of Law Granting Plaintiff's Motion for Preliminary Injunction ("Plaintiff's Findings") (docket entry 24) at 7.

22.     On June 4, 2019, TEG's vice president of national sales, Todd Neely, emailed Gardner to ask why TEG had not been awarded the contract for the 2019 Cowboy Christmas event, and to request an outline of "the areas that made Las Vegas Expo the better choice." Appendix in Support at 15.

23.     Gardner responded on June 5, 2019, citing three factors as to why Las Vegas Events preferred LVE's proposal: 1) the "great relationship" between Cowboy Christmas exhibitors and Jeff Castillo; 2) comparison of the TEG and Las Vegas Expo's bids for the contract showed that the pricing favored LVE, and; 3) TEG and Las Vegas Expo's relative availability of storage space. Appendix in Support at 14. Gardner also denied Neely's request to revisit TEG's proposal. *Id.*

III.  <u>CONCLUSIONS OF LAW</u>

The plaintiff, in its original petition, asserts two claims: breach of contract and tortious interference.  TEG seeks to enjoin Castillo from having any further contact with the TEG customers that Castillo worked with in the twelve months prior to his departure from TEG, and from "taking any further action that would breach his non-disclosure and non-solicitation agreement with TEG." Plaintiff's Findings at 17-18, ¶ 52.

To obtain a preliminary injunction, the moving party must show the following:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Paulsson Geophysical Services, Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008) (citing *Speaks v. Kruse,* 445 F.3d 396, 399-400 (5th Cir. 2006)).  The decision to grant or deny preliminary injunctive relief is left to the sound discretion of the district court. *Mississippi Power & Light Company v. United Gas Pipe Line Company*, 760 F.2d 618, 621 (5th Cir. 1985).  Though the movant must clearly carry its burden of persuasion on each of the four factors, *id.*, as the level of persuasion in relation to the other three factors increases, the degree of persuasion necessary on the substantial likelihood of success factor may decrease.  See *Productos Carnic, S.A. v. Central American Beef & Seafood Trading Company*, 621 F.2d 683, 685-86 (5th Cir. 1980).

A.  Likelihood of Success on the Merits

When determining the likelihood of success on the merits, the court looks to the standards of the substantive law.  See *Roho, Inc. v. Marquis,* 902 F.2d 356, 358 (5th Cir. 1990).  To obtain an injunction, the movant's likelihood of success must be more than negligible, *Compact Van Equipment Company, Inc. v. Leggett & Platt, Inc.,* 566 F.2d 952, 954 (5th Cir. 1978), and the preliminary injunction should not be granted unless the question presented by the litigant is free from doubt, *Congress of Racial Equality v. Douglas,* 318 F.2d 95, 97 (5th Cir.), *cert. denied,* 375 U.S. 829 (1963).  But "[w]here the other factors are strong, a showing of some likelihood of success on the merits will justify temporary injunctive relief." *Productos Carnic, S.A.,* 621 F.2d at 686.

Here, TEG seeks injunctive relief to enforce the Non-Disclosure and Non-Solicitation Agreement ("NDA") that the parties executed on July 20, 2018.  Plaintiff's Findings at 17-18, ¶ 52.  The NDA provides that Texas law governs the agreement and the parties so agree.  Appendix in Support at 6; Plaintiff's Findings at 11; Defendant's Findings at 21.  Thus, to determine TEG's likelihood of success on the merits of its breach of contract claim, the court looks to Texas law.

In Texas, there are four essential elements to a breach of contract claim: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained

by the plaintiff as a result of the breach." *Mullins v. TestAmerica, Inc.,* 564 F.3d 386, 418 (5th Cir. 2009) (citing *Aguiar v. Segal,* 167 S.W.3d 443, 450 (Tex. App.-Houston [14th Dist.] 2005, pet. denied)). Additionally, "[e]nforceability of a non-solicitation agreement is governed by the Covenants Not to Compete Act, Texas Business and Commerce Code § 15.50." *GE Betz, Inc. v. Moffitt-Johnston*, 885 F.3d 318, 328 (5th Cir. 2018). For the reasons stated below, the court concludes that the plaintiff has established a substantial likelihood of success on its breach of contract claim.

1. *Validity & Enforceability of the Non-Disclosure and Non-Solicitation Agreement*

First, the court concludes that it is substantially likely that TEG can prove the non-disclosure and non-solicitation agreement is a valid contract. "Under Texas law, a valid contract requires an offer, acceptance, mutual assent, execution and delivery of the contract with the intent that it be mutual and binding, and consideration." *In re Online Travel Co.*, 953 F. Supp. 2d 713, 718 (N.D. Tex. 2013) (Boyle, J.) (citing *Buxani v. Nussbaum,* 940 S.W.2d 350, 352 (Tex. App.-San Antonio 1997, no writ)). These factors are readily apparent from the face of the NDA. *See* Appendix in Support at 6. Castillo nonetheless contends that the agreement is an unenforceable contract of adhesion which he was coerced into signing under duress and in fear of losing his job. The court is unconvinced by this argument.

"Contracts in which one party has minimal bargaining power, also

- 10 -

referred to as contracts of adhesion, are not automatically void." *Hughes Training Inc. v. Cook*, 254 F.3d 588, 593 (5th Cir. 2001) (citing *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 961 F.2d 1148, 1154 (5th Cir. 1992)), *cert. denied*, 534 U.S. 1172 (2002). "Instead, the party seeking to avoid the contract generally must show that it is unconscionable." *Dillard*, 961 F.3d at 1154. The defendant does not contend that the NDA is unconscionable, nor is the court persuaded by the argument that he was forced to sign the NDA under duress.

"Economic duress occurs when one party to a transaction takes 'undue or unjust advantage' of the other party's 'economic necessity or distress' in order to coerce the other party into making an agreement." *DT Apartment Group, LP v. CWCapital, LLC*, No. 3:12-CV-0437-D, 2013 WL 2317061, at *3 (N.D. Tex. May 28, 2013) (Fitzwater, Chief J.) (quoting *King v. Bishop,* 879 S.W.2d 222, 224 (Tex. App. 1994, no writ)). To prevail on the affirmative defense of duress, the defendant must establish that:

> (1) a threat or action was taken without legal justification; (2) the threat or action was of such a character as to destroy the other party's free agency; (3) the threat or action caused the opposing party's free will to be overcome and caused the other party to do that which it would not otherwise have done and was not legally bound to do; (4) the restraint was imminent; and (5) the opposing party had no present means of protection.

*In re Frank Kent Motor Co.*, 361 S.W.3d 628, 632 (Tex. 2012); *DT Apartment Group*, 2013 WL 2317061, at *3-4. Upon review of the evidence, the court is not persuaded

that TEG engaged in coercive, illegal action, or that Castillo's free agency was destroyed.[2]

The court next must consider the enforceability of the non-solicitation covenant under the two-factor test set forth in section 15.50 of the Texas Business and Commerce Code. See *GE Betz, Inc.*, 885 F.3d at 328. A non-solicitation agreement is enforceable if: (1) "it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made," and (2) it "contains limitations as to time, geographical area, and scope of activity . . . that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Texas Business & Commerce Code § 15.50; *GE Betz, Inc.*, 885 F.3d at 328.

First, as set forth above, the non-solicitation agreement is part of the NDA, which the court concludes was an enforceable agreement at the time it was made. See *Brink's Incorporated v. Patrick*, No. 3:14-CV-775-B, 2014 WL 2931824, at *4 (N.D. Tex. June 27, 2014) (Boyle, J.) (quoting *Marsh USA, Inc. v. Cook,* 354 S.W.3d

---

[2]     Castillo argues that he was forced to sign the NDA under duress because he and his family had to cut their vacation short and drive 15 hours to arrive in Las Vegas in time to sign the NDA. Appendix in Support at 56, 85. Castillo also asserts that he was rushed to sign the NDA, that he was not allowed to make copies of it, that he was not allowed to consult an attorney, and that a TEG human resources employee "demanded" that he sign the NDA. *See* Appendix in Support at 56, 85; Response, ¶ 8. The defendant does not cite any authority in support of the argument that TEG's conduct constitutes duress, nor is the court aware of any.

764, 777 (Tex. 2011)) ("[A] court should not focus on 'overly technical disputes' over whether a covenant is ancillary to an agreement, but should instead inquire 'whether the covenant contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.'") (internal quotations omitted).

With respect to the second factor under § 15.50, "[t]he Texas Supreme Court has explained that 'the fundamental legitimate business interest that may be protected by [non-solicitation] covenants is in preventing employees or departing partners from using the business contacts and rapport established during the relationship . . . to take the [employer]'s customers with him.'" *Oxford Global Resources, Inc. v. Weekley-Cessnun*, No. 3:04-CV-0330-N, 2005 WL 350580, at *6 (N.D. Tex. Feb. 8, 2005) (Godbey, J.) (quoting *Peat Marwick Main* & *Company v. Haass*, 818 S.W.2d 381 (Tex. 1991)). Here, the limitations as to time, geographical area, and scope of activity set forth in the NDA appear reasonably calculated and sufficiently circumscribed to meet a similar interest. *See id.* TEG submits that the non-solicitation covenant restrains Castillo from soliciting only those ten clients with whom Castillo worked during his time at TEG; Castillo remains free to solicit business from other entities without any geographical restriction. See *Oxford*, 2005 WL 350580, at *6 (Upholding non-solicitation covenant that contained no

geographic limitations, but rather, concerned only particular customers).

Furthermore, LVE's president stated in his deposition that approximately 90% of

Castillo's work at LVE involved customers other than Cowboy Christmas and RMEF,

Appendix in Support at 197, which confirms that Castillo remains able to work for

LVE in the city of Las Vegas without breaching the non-solicitation covenant. Cf.

*Brink's*, 2014 WL 2931824, at *5 ("Texas courts have generally held that

non-compete agreements that prevent an individual from performing similar services

to those he provided in territories he previously worked in [are generally] upheld.").

Finally, the non-solicitation covenant only applies for two years from the time

Castillo left TEG on January 18, 2019. The court thus concludes that these

restrictions do not impose a greater restraint than is necessary to protect TEG's

legitimate business interests. *See id.* at *5 ("Texas courts have generally upheld

non-compete periods ranging from two to five years as reasonable."). Accordingly,

the court concludes that the non-solicitation covenant satisfies the requirements of

§ 15.50, and that the NDA is a valid and enforceable contract.

### 2. *Performance, Breach, and Damages*

The court finds that TEG has also established a substantial likelihood of

success on the merits with respect to the second, third, and fourth elements of its

breach of contract claim. First, TEG performed under the agreement by providing

Castillo with access to some of its confidential information. *See* Appendix in Support at 99, 113.

Next, TEG has provided ample evidence to establish a substantial likelihood that Castillo engaged in solicitation of a client with whom Castillo had worked at TEG, in violation of the non-solicitation covenant. For example, Castillo: set up the lunch meeting during which he, Cordaro, and Gardner discussed Cowboy Christmas and RMEF, Appendix in Support at 68-69; listed Las Vegas Events (*i.e.,* the owner of Cowboy Christmas and RMEF) as a prospect in LVE's software program, *id.* at 23; drafted the proposal for the Cowboy Christmas show, and sent a revised proposal to Las Vegas Events, *id.* at 78; was tasked by Cordaro to secure the Cowboy Christmas contract, *see id.* at 24; and remained in frequent contact with the decisionmakers at Las Vegas Events in an effort to land the contract for the 2019 Cowboy Christmas event, *id.* at 32-34. The defendant argues that he did not solicit business from Las Vegas Events because he acted in the capacity of an account manager rather than a sales representative. This argument places form over substance and does not rebut the strong evidentiary showing that Castillo "solicit[ed], call[ed] on, communicate[d] with, . . . [and] attempt[ed] to do business with" Las Vegas Events, in clear contravention of the non-solicitation agreement.

Finally, the plaintiff has also established that Castillo's solicitation likely caused TEG damages, as Las Vegas Events decided not to award the 2019 Cowboy

Christmas contract to TEG in part due to Castillo's relationships with Cowboy Christmas exhibitors. *See* Appendix in Support at 14. Accordingly, with respect to TEG's claim for breach of the non-solicitation covenant, TEG has met the first factor required for this court to grant its request for a preliminary injunction.[3]

## B. <u>Irreparable Harm</u>

The analysis for determining whether harm is irreparable encapsulates the purpose of a preliminary injunction. An injury is generally considered to be irreparable if the injury cannot be undone through monetary relief. *Enterprise International, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472-73 (5th Cir. 1985) (stating that the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weigh[s] heavily against a claim of irreparable harm"). An injunction is appropriate only if the anticipated injury is imminent and irreparable. *Chacon v. Granata*, 515

---

[3]     In light of this determination, the court need not consider TEG's likelihood of success on the merits of its claim for tortious interference. See *Zyvex Corporation v. Starkewolfe*, No. 3:02-CV-190-G, 2002 WL 1359719, at *3 n.6 (N.D. Tex. June 18, 2002) (Fish, Chief J.); see also *Opulent Life Church v. City of Holly Springs, Mississippi*, 697 F.3d 279, 288-89 (5th Cir. 2012) (limiting consideration of the "likelihood of success" factor to the claim on which the parties' briefing focused). Moreover, the court declines to consider the likelihood of TEG's success on the merits of its breach of contract claim with respect to the confidentiality agreement, given the dearth of evidence presented on that issue and the fact that TEG's request for preliminary injunction asks only that the court enjoin Castillo from engaging in further violation of the Non-Disclosure and Non-Solicitation Agreement. Plaintiff's Findings at 17-18, ¶ 52.

F.2d 922, 925 (5th Cir.), *cert. denied,* 423 U.S. 930 (1975).  If determining the amount of damage would be extremely difficult, the court can consider the harm irreparable.  *ICEE Distributors, Inc. v. J & J Snack Foods Corporation,* 325 F.3d 586, 597 (5th Cir. 2003); *Wilkinson v. Manpower, Inc.,* 531 F.2d 712, 714 (5th Cir. 1976).

"In Texas, injury resulting from the breach of non-compete covenants is the epitome of irreparable injury."  *A & A Global Industries, Inc. v. Wolfe*, No. 3:01-CV-1515-D, 2001 WL 1388020, at *5 (N.D. Tex. Nov. 6, 2001) (Fitzwater, J.).  Furthermore, courts in this district and others have held on similar facts that "[t]he use of an employer's confidential information and the possible loss of customers is sufficient to establish irreparable harm."  *Brink's*, 2014 WL 2931824, at *7 (quoting *TransPerfect Translations, Inc. v. Leslie,* 594 F.Supp.2d 742, 757 (S.D. Tex. 2009); *McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 858 (W.D. Tex. 2016).  Nonetheless, a party may not rely on conclusory assertions, but rather, must "submit evidence and carry its burden to demonstrate that there is a substantial threat that it will experience irreparable harm."  *Brink's*, 2014 WL 2931824, at *7.

Here, TEG asserts that the company "has lost two customers and will be irreparably harmed if Castillo solicits TEG's other 8 clients and further disseminates TEG's confidential information."  Plaintiff's Findings at 15, ¶38.  The court agrees.  As set forth above, TEG has established a substantial likelihood that Castillo has already breached the NDA; Castillo played a leading role in soliciting Las Vegas

Events to award LVE the contract for the 2019 Cowboy Christmas and RMEF events. Yet despite substantial evidence to the contrary, Castillo maintains that he "never solicited Cowboy Christmas on behalf of Las Vegas Expo." Response, Exhibit 1 at 5. Castillo also remains employed by LVE in the same area, Las Vegas, and in the same capacity, account manager, in which he operated while working for TEG. *See* Appendix in Support at 70. In light of Castillo's solicitation of business from Las Vegas Events, his denial that his conduct amounted to solicitation, and his continued employment by TEG's competitor in Las Vegas, the court concludes that there is a substantial threat that Castillo will continue to solicit clients with whom he worked at TEG. See *Brink's*, 2014 WL 2931824 at *7 (finding a substantial threat of irreparable harm arising from the defendant's breach of a non-compete clause where the defendant moved to a new company, continued to work in the same city and in the same line of work, and had intimate knowledge of his former employer's procedures, services, and customer base).

Castillo argues that TEG has failed to demonstrate that the threat of harm to the company is irreparable because TEG's vice president of human resources, Mark Robichaud, provided a monetary estimate of the damages TEG had suffered to date during Robichuad's deposition on July 23, 2019. Defendant's Response at 20; Appendix in Support at 123. The plaintiff argues that if damages are so readily

calculable, TEG cannot establish that legal remedies would be inadequate.

Defendant's Findings at 37.  The court is not persuaded.

Although Robichaud provided what he called a "back of the napkin" estimate of the profits TEG would have made had TEG been awarded the contract for Cowboy Christmas and RMEF in 2019, this testimony is not dispositive.  See *Ruscitto v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 777 F. Supp. 1349, 1352, 1354 (N.D. Tex.) (Fitzwater, J.), *aff'd sub nom.*, 948 F.2d 1286 (5th Cir. 1991) (finding a substantial likelihood of irreparable harm arising from breach of a non-compete clause, notwithstanding the plaintiff's provision of specific figures regarding the monetary losses the plaintiff stood to suffer absent injunctive relief), *cert. denied*, 504 U.S. 930 (1992).  Rather, Robichaud's other testimony establishes that Castillo's continued breach of the non-solicitation covenant would likely cause damages that would be difficult to calculate and thus irreparable.  See *ICEE Distributors, Inc.,* 325 F.3d at 597.  For example, Robichaud testified that TEG had a "great relationship" with Las Vegas Events, and that if "Castillo wouldn't have went and did what he did, there is a high likelihood that [TEG] would have continued that relationship with them." Appendix in Support at 123.  The court finds this particularly persuasive, given the fact that TEG, and Xpert before it, was awarded the Cowboy Christmas contract from 2015 to 2018.  The loss of the relationship with Las Vegas Events, and of relationships with any other clients that Castillo may solicit in the future, would be

difficult to calculate as there is no telling how long these relationships may have continued into the future.

The court therefore concludes that the plaintiff has established a substantial likelihood of irreparable harm for which monetary relief would be inadequate.

## C. Weighing the Threatened Harm

Upon thorough review of the record, the court concludes that the threatened injury to TEG outweighs any potential harm that the injunction will cause to Castillo. As noted above, TEG has established that it faces a substantial likelihood of irreparable harm absent injunctive relief. On the other hand, if a preliminary injunction issues, Castillo will be permitted to work in any geographic area and for any employer, so long as he does not violate the terms of the non-solicitation agreement with respect to the ten entities that Castillo worked with during his time at TEG. The court notes again that approximately 90% of Castillo's work at LVE was on projects with clients that Castillo is not restrained from working with under the non-solicitation agreement. Accordingly, the court concludes that TEG has met the third factor required for this court to grant its request for a preliminary injunction. See *Oxford,* 2005 WL 350580, at *6 (concluding that the balance of hardships favored employer where employee was preliminarily enjoined from pursuing former customers but could still solicit business from new customers).

D.  Consideration of the Public Interest

Finally, the court considers the impact that the grant of a preliminary injunction would have upon the public interest.  The burden is on the plaintiff to show that a grant of injunctive relief will not disserve the public interest.  *Defense Distributed v. United States Department of State*, 838 F.3d 451, 457 (5th Cir. 2016), *cert. denied*, – U.S. – , 138 S. Ct. 638 (2018); *Sigmar*, 529 F.3d at 309.  Texas law favors the enforceability of covenants not to compete and the enforceability of valid contracts.  Texas Business & Commerce Code § 15.50; *Marsh USA, Inc. v. Cook,* 354 S.W.3d 764, 771 (Tex. 2011).  "In fact, enforcing non-competition agreements falls within Texas'[s] fundamental policy."  *Bay Cities Recovery, Inc. v. Digital Recognition Network, Inc.*, No. 4:18-CV-280-A, 2018 WL 4903233, at *3 (N.D. Tex. Oct. 5, 2018) (McBryde, J.) (citing *McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 851 (W.D. Tex. 2016)).  The court therefore concludes that in this case, issuance of a preliminary injunction to enforce the terms of the NDA will not disserve the public interest.

Thus, the court concludes that the plaintiff has established all four of the factors required for this court to grant its request for a preliminary injunction.

IV.  CONCLUSION

In accordance with the foregoing, the court concludes that the plaintiff's motion for a preliminary injunction should be **GRANTED**.

Effective immediately and continuing through the duration of this civil action or until January 18, 2021, defendant Jeff Castillo is hereby and immediately enjoined as follows:

1.  Castillo shall not have any further contact with the ten TEG customers he worked with in the twelve months prior to his departure from TEG, specifically identified as: 1) Cowboy Christmas; 2) Rocky Mountain Elk Foundation (RMEF); 3) Barrett-Jackson; 4) Rock N Roll Marathon; 5) VIVA Las Vegas; 6) ThoughtSpot; 7) NFM (Genetech); 8) PAI Innkeepers; 9) United Union of Roofers, Water Proofers and Allied Workers, and; 10) Service Management and Automation User Conference (SMAC). This restriction specifically includes working for any of these customers prior to, during, or after their shows and expositions in any capacity, and working on any of these shows and expositions in any capacity.

2.  Castillo shall take no further action in breach of his non-disclosure and non-solicitation agreement with TEG.

3.  This injunction shall be effective as soon as TEG posts a bond with the clerk in the amount of $10,000.00[4].

---

[4] The defendant requests that the bond amount be set at $225,000 to $300,000, Response at 24, a figure he arrived at by multiplying his current annual salary ($75,000) by the estimated life of the litigation, three or four years. *Id.* The defendant's proposed bond amount is excessive, as the preliminary injunction should only be in effect until January 18, 2021 – the date on which the two-year non-solicitation bar in the defendant's non-disclosure and non-solicitation agreement expires. Thus, using the defendant's salary as a metric, the bond amount should be $98,333.33 ($75,000/year x 1 year, 3 months, and 22 days.) As noted above, however, 90% of Castillo's work at LVE is on projects not affected by this preliminary injunction. Even under the defendant's reasoning, therefore, a bond of $10,000.00 should adequately protect him if it is later determined that he was wrongfully enjoined.

September 25, 2019.

A. JOE FISH
**Senior United States District Judge**